## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

ZENAS ZELOTES, Esq.,       :
         Plaintiff,     :
                            :
v.                        :     Case No: 3:05cv1591 (PCD)
                            :
DEIRDRE A. MARTINI, in her official   :
capacity as Acting United States Trustee,  :
Region 2,                    :
         Defendant.    :

## <u>RULING ON MOTION TO DISMISS</u>

Plaintiff brings this action challenging the constitutionality of one provision of the Bankruptcy Code enacted in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Specifically, Plaintiff challenges 11 U.S.C. § 526(a)(4) as violative of the First Amendment. Defendant moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiff's Complaint in its entirety. For the reasons that follow, Defendant's Motion to Dismiss [Doc. No. 11] is **denied**.

## I.      BACKGROUND

Plaintiff is a bankruptcy attorney who maintains law offices in New London, Shelton and Hartford, Connecticut. (Compl. ¶ 5.) Plaintiff asserts that he is a "Debt Relief Agency," as defined by 11 U.S.C. § 101(12A),[1] and his clients are "Assisted Persons," as defined by 11

---

[1] "The term 'debt relief agency' means any person who provides any bankruptcy assistance to an assisted person in return for the payment of money or other valuable consideration, or who is a bankruptcy petition preparer under section 110 [11 USCS § 110]." 11 U.S.C. § 101(12A). Other district courts have held that bankruptcy attorneys fall within the definition of "Debt Relief Agency." See <u>Olsen v. Gonzales</u>, No. 05-6365-HO, 2006 U.S. Dist. LEXIS 56197, *7-8 (D. Or. Aug. 11, 2006); <u>Hersh v. United States</u>, 347 B.R. 19, 23 (N.D. Tex. 2006). Defendants do not raise the issue here, and therefore, this Court will assume that Plaintiff meets the definition as well.

U.S.C. § 101(3).[2]  Defendant is being sued in her official capacity as Acting United States

Trustee, Region 2.  As a United States Trustee, Defendant is one of the officials charged with

enforcing the provision at issue here.

## II.     STANDARD OF REVIEW

The function of a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim

is "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which

might be offered in support thereof."  Ryder Energy Distribution Corp. v. Merrill Lynch

Commodities, Inc., 748 F.2d 774, 776 (2d Cir. 1984) (citation omitted).  Therefore, when

considering such a motion, the court must accept the facts alleged in the complaint as true.

Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  Dismissal of a complaint under Rule 12(b)(6) is

inappropriate unless "it is clear that no relief could be granted under any set of facts that could be

proved consistent with the allegations." I. Meyer Pincus & Associates v. Oppenheimer & Co.,

936 F.2d 759, 762 (2d Cir.1991); see also Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996)

(Courts should not grant a Rule 12(b)(6) motion to dismiss merely because recovery seems

unlikely or remote, as "[t]he issue is not whether a plaintiff will ultimately prevail but whether

the claimant is entitled to offer evidence to support the claims.").

## III.    DISCUSSION

Plaintiff brings this action as a facial challenge to the constitutionality of 11 U.S.C. §

526(a)(4), which provides:

A debt relief agency shall not . . . advise an assisted person or prospective assisted
person to incur more debt in contemplation of such person filing a case under this

---

[2]        "The term 'assisted person' means any person whose debts consist primarily of consumer debts
and the value of whose nonexempt property is less than $150,000." 11 U.S.C. § 101(3).

> title or to pay an attorney or bankruptcy petition preparer fee or charge for services
> performed as part of preparing for or representing a debtor in a case under this title.

11 U.S.C. § 526(a)(4).  If an attorney violates this provision, he or she may be obligated to return

"any fees or charges" paid to him or her by the debtor-client along with "actual damages" and

"reasonable attorneys' fees." 11 U.S.C. § 526(c)(2)(A).  Moreover, state attorneys general may

bring actions to enjoin violations of § 526 and recover damages for debtors, and a court on its

own motion, the United States Trustees or debtors may bring actions seeking injunctive relief or

civil penalties. 11 U.S.C. §§ 526(c)(3), (5).

Plaintiff asserts that he "intends to advise clients (and prospective clients) to incur

additional debt in contemplation of their seeking relief under the bankruptcy code and

concurrently intends to advise his clients to incur additional debt to pay their attorney (the

Plaintiff)." (Compl. ¶ 8.)  Plaintiff contends that § 526(a)(4) violates the First Amendment of the

United States Constitution by impermissibly impairing, and threatening to chill, his free speech

rights. (Id. ¶ 11.)  Plaintiff asks the Court to declare § 526(a)(4) unconstitutional, to order

preliminary and permanent injunctive relief enjoining its enforcement, to award costs, and direct

such other relief as the Court deems just and equitable.

### A.    Standing

In a footnote, Defendant raises the issue of whether Plaintiff has standing to bring this

claim, as no entity has taken action to enforce BAPCPA against him. (See Mot. Dismiss 7 n.6.)

In order for the Court to have jurisdiction over an action, it must satisfy Article III's "case or

controversy" requirement:

> Article III, § 2, of the Constitution confines federal courts to the decision of "Cases"
> or "Controversies." Standing to sue or defend is an aspect of the case-or-controversy

3

requirement. To qualify as a party with standing to litigate, a person must show, first and foremost, "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent."

Arizonans For Official English v. Arizona, 520 U.S. 43, 64, 117 S. Ct. 1055, 137 L. Ed. 2d 170 (1997). Three elements must be established for Plaintiff to satisfy Article III's case or controversy requirement of standing. First, Plaintiff must have suffered an "injury in fact"—i.e., "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (internal quotations and citations omitted). Second, there must be a causal connection between the injury and the challenged conduct. Id. Third, it must be likely that Plaintiff's injury can be redressed by a favorable decision. Id. at 561. The "party invoking federal jurisdiction bears the burden of establishing these elements." Id.

Although "as applied" challenges are generally preferred to facial ones,[3] "the First Amendment challenge has unique standing issues because of the chilling effect, self-censorship, and in fact the very special nature of political speech itself." Ctr. for Individual Freedom v. Carmouche, 449 F.3d 655, 660 (5th Cir. 2006) (citation omitted). In Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 392, 108 S. Ct. 636, 98 L. Ed. 2d 782 (1988), the Supreme Court stated that "the alleged danger of [the challenged statute] is, in large measure, one of self-censorship; a harm

---

[3]    A "facial challenge" to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual, see City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 770 n.11, 108 S. Ct. 2138, 100 L. Ed. 2d 771 (1988), whereas an "as applied challenge" requires a case-by-case analysis of whether the application of a statute, even if facially constitutional, deprived the individual to whom it was applied of a protected right, see, e.g., Wisconsin Right to Life, Inc. v. FEC, 126 S. Ct. 1016, 163 L. Ed. 2d 990 (2006). The Supreme Court has indicated a general preference for as applied challenges, noting that "[f]acial invalidation 'is manifestly, strong medicine' that 'has been employed by the Court sparingly and only as a last resort.'" Nat'l Endow. for the Arts v. Finley, 524 U.S. 569, 580, 118 S. Ct. 2168, 141 L. Ed. 2d 500 (1998) (citation omitted).

4

that can be realized even without an actual prosecution."  Plaintiff alleges that his speech is chilled by the provision at issue, (Complaint ¶ 11), and this alleged suppression since the enactment of the BAPCPA is sufficient to establish standing. See Am. Booksellers Ass'n, 484 U.S. at 392 (holding, in the context of a First Amendment claim, that the plaintiffs had standing, "as the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution"); Laird v. Tatum, 408 U.S. 1, 12-13, 33 L. Ed. 2d 154, 92 S. Ct. 2318 (1972) (stating that "constitutional violations may arise from the deterrent, or 'chilling' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights").  The threat of civil penalties here and the concomitant suppression of Plaintiff's speech are very real injuries. See Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L. Ed. 2d 895 (1979) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement [but] . . . does not have to await the consummation of threatened injury to obtain preventive relief."); Mastrovincenzo v. City of New York, 435 F.3d 78, 89 (2d Cir. 2006) ("it is well settled that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); Vt. Right to Life Comm. v. Sorrell, 221 F.3d 376, 382 (2d Cir. 2000) (noting that the fear of civil penalties can be as inhibiting of speech as the threat of criminal prosecution, and finding that plaintiffs had standing); Levin v. Harleston, 966 F.2d 85, 89-90 (2d Cir. 1992) (holding that the university's implicit threats of future censure against the faculty was sufficient to violate First Amendment rights).  Accordingly, it is found that Plaintiff has standing to bring this facial challenge to 11 U.S.C. § 526(a)(4). See Hersh v. United States, 347 B.R. 19, 22 n.3

(N.D. Tex. 2006) (finding that plaintiffs had standing to challenge 11 U.S.C. § 526(a)(4) on the ground that it chilled their speech); Olsen v. Gonzales, No. 05-6365-HO, 2006 U.S. Dist. LEXIS 56197, *17 (D. Or. Aug. 11, 2006) (same); but see Geisenberger v. Gonzales, 346 B.R. 678 (D. Pa. 2006) (finding that the plaintiff lacked standing to challenge the constitutionality of 11 U.S.C. § 526(a)(4), in addition to other provisions of BAPCPA, because the plaintiff had failed to allege that "the federal government or the Commonwealth of Pennsylvania has threatened to enforce the 'debt relief agency' provisions of BAPCPA against him," or that "he sustained or is in imminent danger of suffering an economic loss from the enactment of the BAPCPA provisions" at issue).

### B. Facial Challenge to § 526(a)(4)

The two other district courts to address the question of the constitutionality of 11 U.S.C. § 526(a)(4) to date have both found the provision unconstitutional. See Hersh, 347 B.R. 19; Olsen, 2006 U.S. Dist. LEXIS 56197. As in those cases, this Court finds, regardless of whether strict scrutiny or the Gentile standard is applied,[4] 11 U.S.C. § 526(a)(4) is facially unconstitutional.

When strict scrutiny applies, the government may regulate the content of constitutionally protected speech only if the regulation is (1) narrowly tailored to promote (2) a compelling government interest. Sable Comm'ns of California, Inc. v. FCC, 492 U.S. 115, 126, 109 S. Ct. 2829, 106 L. Ed. 2d 93 (1989). In Gentile v. State Bar of Nevada, 501 U.S. 1030, 1073-75, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991), on the other hand, the Supreme Court balanced lawyers'

---

[4]    The government argues that § 526(a)(4) is an ethical regulation, and thus subject to the more lenient Gentile standard. Because the challenged provision fails under either standard, the Court need not decide which applies.

First Amendment interests "against the State's legitimate interest in regulating the activity in question," and held that an ethical restriction imposed on attorney speech was permissible where it (1) served the State's legitimate interest, i.e., prohibiting speech that would create a substantial likelihood of material prejudice to judicial proceedings, and (2) "impose[d] only narrow and necessary limitations on lawyers' speech."  Because the provision at issue fails under either standard, its constitutionality will be assessed under the more lenient <u>Gentile</u> standard.

1.    <u>Governmental Interest</u>

In enacting BAPCPA, Congress sought to "improve bankruptcy law and practice by restoring personal responsibility and integrity in the bankruptcy system and ensure that the system is fair for both debtors and creditors." H.R. Rep. No. 109-31, pt. 1, at 1 (2005), <u>as reprinted in</u> 2005 U.S.C.C.A.N. 88, 89.  BAPCPA's "consumer protections include provisions strengthening professionalism standards for attorneys and others who assist consumer debtors with their bankruptcy cases." <u>Id</u>. at 103.  After conducting hearings on the bankruptcy laws and practice in effect at the time, Congress found that there has been a "generally consistent upward trend" in consumer bankruptcy filings.[5] <u>Id</u>. at 90.  Congress concluded that "the increase in consumer bankruptcy filings has adverse financial consequences for our nation's economy," and noted that "in 1997 alone more than $44 billion of debt was discharged by debtors who filed for bankruptcy relief, a figure when amortized on a yearly basis amounts to a loss of at least $110 million every day." <u>Id</u>. at 91.  According to one estimate, these losses "translate into a $400 annual 'tax' on every household in our nation." <u>Id</u>.  Congress enacted BAPCPA, in part, to

---

[5]    Specifically, Congress noted that "[i]n 1998, . . . bankruptcy filings exceeded one million for the first time in our nation's history. Over the past decade, the number of bankruptcy filings has nearly doubled to more than 1.6 million cases filed in fiscal year 2004." <u>Id</u>.

7

mitigate the financial toll that the increasing number of bankruptcy filings were taking on creditors and the economy as a whole. Id.

Also motivating Congress to enact comprehensive reforms was the finding that "the present bankruptcy system has loopholes and incentives that allow and sometimes even encourage opportunistic personal filings and abuse." Id. at 92. Congress looked at a civil enforcement initiative undertaken by the United States Trustee Program which "consistently identified" problems such as "debtor misconduct and abuse, misconduct by attorneys and other professionals, problems associated with bankruptcy petition preparers, and instances where a debtor's discharge should be challenged." Id. (internal citations omitted). The United States Trustee Program concluded that "[a]buse of the system is more widespread than many would have estimated," and "ultimately hurts consumers as well as creditors." Id. (internal citations omitted).

Specifically with regard to § 526(a)(4), which prohibits an attorney from "advis[ing]" a consumer debtor (1) "to incur more debt in contemplation of" filing for bankruptcy or (2) "to incur more debt . . . to pay an attorney or bankruptcy petition preparer," 11 U.S.C. § 526(a)(4), Congress also heard testimony to the effect that its addition of a "means test" that depends on debt levels, see 11 U.S.C. § 707(b)(2)(A),[6] would increase the likelihood that a bankruptcy

---

[6] The "means test" is used to determine whether the presumption that a Chapter 7 filing is abusive should apply. If the filing is determined to be abusive, it is dismissed or converted to a Chapter 11 or 13 filing. 11 U.S.C. § 707(b)(1). Under this test, an abuse of the bankruptcy system is presumed when the amount of the debtor's income, after deduction of certain expenses and other specified amounts, exceeds specified thresholds. 11 U.S.C. § 707(b)(2)(A).

attorney would advise his or her client to take on debt before filing for bankruptcy.[7]  The

Honorable Randall Newsome, United States Bankruptcy Judge for the Northern District of

California, testified to this effect:

> The more debt that is incurred prior to filing, the more likely the debtor will qualify
> for chapter 7.  Perverse as it may seem, I can envision debtor's counsel advising their
> clients to buy the most expensive car that someone will sell them, and sign on to the
> biggest payment they can afford (at least until the bankruptcy is filed) as a way of
> increasing their deductions under § 109(h).

Bankruptcy Reform Act of 1998: Part I, Hearing on H.R. 3150 before the House Judiciary

Comm., 105th Cong., 2d Sess. 25 (1998) (Ex. A to Def.'s Mot. Dismiss).

2.      Limitations on Lawyers' Speech

Rather than changing the bankruptcy system by closing the loopholes, eliminating the

incentives for opportunistic action or enacting penalties for those who take on such debt prior to

filing for bankruptcy, Congress enacted § 526(a)(4), a prophylactic rule which prohibits attorneys

from advising their clients to take on *any* additional debt in contemplation of bankruptcy, even

when doing so would be lawful.  As Plaintiff argues, and as both the Hersh and Olsen courts

found, there are instances whereby taking on more debt in contemplation of bankruptcy would

not constitute abuse of the bankruptcy system.  Without delving too deep into the complexities of

bankruptcy law, it is clear that the prohibition in § 526(a)(4), while addressing opportunistic

abuses, could also ensnare lawful, financially prudent actions.  The Hersh and Olsen courts noted

examples where the prohibition could reach lawful and beneficial actions, including (1)

---

[7]      Because the amount of secured and priority debt is one of the amounts deducted from income in
the means test, increasing the amount of debt could reduce the amount of income under this test,
and thus allow an individual who would otherwise fall within the presumption of abuse to evade
that presumption.  Similarly, since the trigger for the presumption is based on the ratio of
"available income" to the amount of "unsecured debt," increasing the amount of unsecured debt
could also help an assisted person evade the presumption of abuse.

"refinancing at a lower rate to reduce payments and forestall or even prevent entering bankruptcy," (2) "taking on secured debt such as [a] loan on an automobile that would survive bankruptcy and also enable the debtor to continue to get to work and make payments," (3) "taking out a loan to obtain the services of bankruptcy attorney, to pay the filing fee in a bankruptcy case or the conversion of a non-exempt asset to an exempt asset which is still allowed under the Bankruptcy code," and (4) "refinanc[ing] a mortgage that allows a debtor to pay off the mortgage and other debts, such as credit card debt, in a chapter 13 where failure to refinance may only allow the debtor sufficient funds to pay off one or the other but not both." Hersh, 347 B.R. at 24; Olsen, 2006 U.S. Dist. LEXIS 56197, at *20.  Plaintiff cited these and other examples of lawful, financially prudent actions, including: (1) borrowing money from friends and family or taking out a secured loan to obtain the services of a bankruptcy attorney or to pay a filing fee, in order to (a) prevent a wage garnishment or attachment, (b) prevent a home foreclosure, repossession or associated costs or (c) avoid a preferential payment or fraudulent transfer to insiders; and (2) borrowing from friends and family or taking out a secured loan to finance the purchase of a new vehicle in order to (a) purchase a less expensive vehicle with lower monthly payments in order to maintain transportation, (b) obtain transportation and secure employment, (c) avoid the higher rate of interest—and therefore, potentially higher likelihood of default—which the debtor would face after filing for bankruptcy, (d) obtain a more economical and/or reliable vehicle in order to reduce average monthly expenses.[8]

---

[8]    The government's argument that these actions may not be prohibited because they would be done for reasons other than "in contemplation of filing for bankruptcy" is unpersuasive.  It would strain the text of the statute to find that advising a client to take on more debt is prohibited only if the client is only advised to take on more debt in contemplation of filing for bankruptcy and not for other reasons.  The text of the statute indicates that regardless of what the other reasons for incurring debt might be, advising a client to take on more debt in contemplation of bankruptcy is

By prohibiting lawyers from advising clients to take a course of action that is lawful and in the client's best financial interest, albeit a counterintuitive one, § 526(a)(4) prevents lawyers from giving clients the best and most complete advice.[9]  As Plaintiff argues, "[s]ection 526 chills the attorney's very exercise of the advice and counsel function that is the defining feature of our profession." (Pl.'s Opp. 11.)  By prohibiting lawyers from advising clients to take lawful, prudent actions as well as abusive ones, § 526(a)(4) is overbroad and restricts attorney speech beyond what is "narrow and necessary" to further the governmental interest. Gentile, 501 U.S. at 1075; Hersh, 347 B.R. at 25 (citing In re R. M. J., 455 U.S. 191, 203, 102 S. Ct. 929, 71 L. Ed. 2d 64 (1982) (Even under intermediate scrutiny, "[s]tates may not place an absolute prohibition on certain types of potentially misleading information . . . if the information also may be presented in a way that is not deceptive."); Conant v. Walters, 309 F.3d 629, 638-39 (9th Cir. 2002) (finding that government could not justify policy that threatened to punish a physician for recommending to a patient the medical use of marijuana on ground that such a recommendation might encourage illegal conduct by the patient)); Olsen, 2006 U.S. Dist. LEXIS 56197, at *21. Accordingly, the Court finds 11 U.S.C. § 526(a)(4) facially unconstitutional.[10]

---

prohibited.  If Congress wishes to curb abusive practices, it can do so directly, rather than broadly restricting attorney advice on otherwise lawful courses of action.

[9]     The Hersh court noted that § 526(a)(4) prevents attorneys from presenting otherwise legitimate, prudent options to their clients and to the courts, and cited Legal Services Corp. v. Velazquez, 531 U.S. 533, 545, 121 S. Ct. 1043, 149 L. Ed. 2d 63 (2001) for the proposition that "[b]y seeking to prohibit the analysis of certain legal issues and to truncate presentation to the courts, the enactment under review prohibits speech and expression upon which the courts must depend for the proper exercise of judicial power." 347 B.R. at 24 n.9.

[10]     Plaintiff attaches, and attempts to incorporate, a brief filed by the plaintiffs in Connecticut Bar Ass'n v. United States, No. 06cv729 (CFD) (D. Conn.), however, the claims raised by the plaintiffs in that case are substantially broader and challenge more provisions than the one at issue here.  The government argues that Plaintiff cannot amend his complaint by attaching that memorandum.  The Court found the challenged provision unconstitutional without reference to the memorandum, and

**IV.     CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss [Doc. No. 11] is **denied**.  As

this ruling disposes of all issues in the case, Plaintiff shall move for judgment to close the file

within ten (10) days of the date of this ruling.

SO ORDERED.

Dated at New Haven, Connecticut, November  7 , 2006.

_____
/s/
Peter C. Dorsey, U.S. District Judge
United States District Court

therefore its incorporation is unnecessary.